**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CARMELO HERRERA, | : |
| Petitioner, | : Civil Action No. 11-0734 (SRC) |
| v. | : **OPINION** |
| PETER K. LAGANA, et al., | : |
| Respondents. | : |

**APPEARANCES:**

Petitioner pro se
Carmelo Herrera
Northern State Prison
P.O. Box 2300
Newark, NJ 07114

Counsel for Respondents
Stephanie Paige Davis-Elson
Assistant Prosecutor of Hudson County
595 Newark Avenue
Jersey City, NJ 07306

**CHESLER**, District Judge

    Petitioner Carmelo Herrera ("Petitioner"), a prisoner currently confined at Northern State Prison in Newark, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Administrator Peter K. Lagana and the Attorney General of New Jersey.

    For the reasons stated herein, the Petition will be dismissed.

## I. BACKGROUND

A.  Factual Background

The relevant facts are set forth in the opinion of the Supreme Court of New Jersey.[1]

On February 26, 2002, Benjamin Valentin, a sixty-three-year-old private security guard, was assigned to work the 4:00 p.m. to 12:00 a.m. shift in a Hoboken housing complex. He had been working in that area for approximately one month. At the conclusion of his shift, Valentin entered his car and drove to the exit to wait for traffic to pass. While stopped, Valentin observed a man, later identified as defendant Carmelo Herrera, approach on his bicycle before stopping near the front of Valentin's car and yelling something. Valentin did not hear what defendant said to him and lowered his window. Defendant walked to the window and asked Valentin for five dollars. When Valentin replied that he had no money, defendant punched him twice, once in the face and once on the back of the neck, knocking Valentin unconscious. When Valentin regained consciousness, his car was missing and he was bleeding. He walked to a nearby security booth and called the police.

Officer James Miller of the Hoboken Police Department arrived at the scene a short while later. Valentin related the incident and described his assailant as a Hispanic male, about 5'7", with a husky build, and a scar on his face, who was wearing something white and red.[FN1] Valentin was taken to St. Mary's hospital in Hoboken for treatment.

> [FN1] At trial Officer Miller testified that Valentin described defendant as a "Hispanic male about five-seven in height, wearing blue jeans, white sneakers, black jacket with red lettering, and he had a short style cut black hair." On cross-examination, Officer Miller stated the "red lettering" was not referenced in his report, but he recalled Valentin saying red lettering.

Meanwhile, Officer Joseph Carr of the Harrison Police Department was called to an accident scene shortly after 1:00 a.m. He observed a damaged vehicle in the roadway with the front passenger side tire missing. A man, later identified as defendant, was standing in front of the vehicle. Because defendant appeared intoxicated, Officer Carr arrested and transported him to the police station to administer a breathalyzer test. A search of his person revealed four black belt keepers, which are used by police or security personnel to secure their belts to gun

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

holsters. While preparing his report, Officer Carr received information that the damaged vehicle was stolen from Hoboken.

After the Hoboken police were informed that Valentin's car had been recovered, Lieutenant Edward Mecka contacted the Hudson County Prosecutor's Office to request a "showup" between the victim and the person found with the victim's car. Following that conversation, Lieutenant Mecka and Detective Padilla traveled to St. Mary's Hospital where they informed Valentin of the situation and asked him to go to the police station to identify the man who attacked him. Lieutenant Mecka transported Valentin to the station, where, on arrival, Lieutenant Mecka learned that defendant had been taken to West Hudson Hospital, so the Lieutenant drove Valentin there. As soon as Valentin entered the emergency room of the hospital, he looked around and identified defendant, who was sitting on a hospital bed about six feet away, as the man who had attacked him. The only other persons in the emergency room were two police officers and nurses.

State v. Herrera, 187 N.J. 493, 496-97 (2006).

B.  Procedural History

Petitioner was indicted for first-degree carjacking, N.J.S.A. 2C:15-2, and third-degree receiving stolen property, N.J.S.A. 2C:20-7. Prior to trial, he unsuccessfully moved to suppress Valentin's out-of-court identification. Following a jury trial in the Superior Court of New Jersey, Law Division, Hudson County, Petitioner was found guilty of both counts. On August 19, 2003, the trial court sentenced Petitioner to a term of thirty years imprisonment, subject to an eighty-five percent period of parole ineligibility under New Jersey's No Early Release Act, N.J.S.A. 2C:43-7.2. (Answer, Ex. Ra25-Ra26.)

On direct appeal, the Superior Court of New Jersey, Appellate Division, affirmed the convictions but remanded for resentencing, based on the trial judge's erroneous understanding that New Jersey law imposed a twenty-year presumptive sentence for carjacking. (Answer, Ex. Ra151-Ra168, Opinion of Superior Court of New Jersey, Appellate Division (Feb. 23, 2005).) Petitioner sought certification from the Supreme Court of New Jersey, which granted certification "limited to the issue of the identification procedure used by the police." (Answer, Ex. Ra199.)

3

More specifically with respect to the federal issue raised, Petitioner argued that the showup identification procedure was impermissibly suggestive and resulted in a very substantial likelihood of irreparable misidentification, in violation of Petitioner's Fourteenth Amendment right to due process, under United States v. Wade, 388 U.S. 218 (1967), and its progeny Stovall v. Denno, 388 U.S. 392 (1967), Neil v. Biggers, 409 U.S. 188 (1972), and Manson v. Brathwaite, 432 U.S. 98 (1977). (Answer, Ex. Ra200-Ra232, Defendant's Supplemental Brief before the Supreme Court of New Jersey.) On June 20, 2006, the Supreme Court of New Jersey affirmed the conviction. State v. Herrera, 187 N.J. 493 (2006).

During the pendency of the direct appeal, Petitioner was resentenced on April 14, 2005, to the same sentence previously imposed. (Answer, Ex. Ra169-Ra170, Judgment on Resentencing.) Petitioner appealed his sentence, and on June 4, 2007, the Appellate Division affirmed. (Answer, Ex. Ra 335, Order of Superior Court, Appellate Division (June 4, 2007).) Petitioner did not further appeal his sentence.

Petitioner's initial petition for state post-conviction relief ("PCR"), filed on or about September 22, 2006, was dismissed without prejudice, as premature, on November 9, 2006. (Answer, Exs. Ra796-Ra806 (PCR Petition), Ra807 (Order).) On December 3, 2007, following the conclusion of Petitioner's direct appeals, he refiled his state petition for post-conviction relief, in which he asserted the following grounds for relief:

Ground 1:

TRIAL COUNSEL'S FAILURE TO PERFORM PROPER PRE-TRIAL INVESTIGATION OF BOTH STATE AND MATERIAL WITNESSES, LACK OF TRIAL PREPARATION, FAILURE TO ESTABLISH AN EFFECTIVE DEFENSE, AND TO RAISE CORRECT ARGUMENT TO THE TRIAL COURT REGARDING IDENTIFICATION PROCEDURES WERE SO EGREGIOUS AS TO DENY DEFENDANT HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND A FAIR TRIAL AS PROVIDED BY THE U.S.

4

CONSTITUTION, AMENDS. VI AND XIV; N.J. CONSTITUTION, ART. I, PAR. 10.

Ground 2:

DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CONSTITUTIONALLY GUARANTEED TO HIM AS PROVIDED BY THE U.S. CONSTITUTION, AMENDS. VI, AND XIV; N.J. CONSTITUTION, ART. I, PAR. 10.

(Answer, Ex. Ra-341, Defendant's Verified Petition seeking PCR relief.) In his supplemental brief, Petitioner also argued that trial counsel was ineffective for coercing him not to testify, for failing to pursue an intoxication defense and to request an intoxication charge, for failing to request a cross-racial identification charge, for failing to argue certain mitigating factors relevant to sentencing, and for cumulative errors. Also in his supplemental brief, Petitioner argued that appellate counsel was ineffective in failing to argue that the trial court erred by not charging trespass and by failing to adequately argue the mitigating factors on appeal. (Answer, Ex. Ra349-Ra376, Defendant's Supplemental Brief.) On May 9, 2008, following oral argument, the trial court denied relief. (Answer, Ex. Ra571-Ra592, ) On March 8, 2010, the Appellate Division affirmed the denial of relief. State v. Herrera, No. A-5834-07T4, 2010 WL 816816 (N.J. Super. App.Div. Mar. 8, 2010). On August 3, 2010, the Supreme Court of New Jersey denied certification. State v. Herrera, 203 N.J. 580 (2010).

This Petition, with supporting documents dated February 7, 2011, followed. Here, Petitioner asserts the following grounds for relief:

> Ground One: Identification procedures used by the police were impermissibly suggestive in violation of the Sixth and Fourteenth Amendments, not following the latest scientific techniques tainting [sic] the identification evidence which should have resulted in reversal of the convictions based on either the federal or state constitution. ...

5

> Ground Two: Trial and appellate counsel were ineffective in failing to argue that the latest scientific techniques should have barred the identification testimony pursuant to either the federal or state constitution, contrary to petitioner's Sixth and Fourteenth Amendment rights.

(Petition, ¶ 12.)[2] Respondents have answered, asserting that the petition is both time-barred and meritless. Petitioner has replied and this matter is now ready for decision.

## II. 28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and

---

[2] With respect to Ground One, to the extent Petitioner is arguing that the decision to admit the identification evidence was a violation of state law, it is well-established that "'federal habeas corpus relief does not lie for errors of state law.'" Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).

nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).

A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. "This standard ... is 'difficult to meet': To obtain habeas corpus relief from a federal court, a state prisoner must show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Metrish v. Lancaster, 133 S.Ct. 1781, 1786-87 (2013) (quoting Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011)). In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). Moreover, the deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent."

Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010); Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### III. ANALYSIS

A. Timeliness

Respondents urge this Court to dismiss the Petition with prejudice as untimely. In his Reply in support of the Petition, Petitioner does not address this defense. Nevertheless, the Petition clearly is timely.

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d),[3] which provides in pertinent part:

> (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[3] The limitations period is applied on a claim-by-claim basis. See Fielder v. Verner, 379 F.3d 113 (3d Cir. 2004), cert. denied, 543 U.S. 1067 (2005); Sweger v. Chesney, 294 F.3d 506 (3d Cir. 2002).

8

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

Here, Petitioner does not assert any claims that rely on factual predicates discovered, or constitutional rights recognized, after the date of his conviction. Nor does he allege any impediments to filing a federal habeas petition. Thus, evaluation of the timeliness of this § 2254 petition requires a determination of, first, when the pertinent judgment became "final," and, second, the period of time during which any application for state post-conviction relief was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court. See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13. The Supreme Court has made clear that the federal limitations period does not begin to run until both the conviction and sentence become final, including review of amended sentences entered before filing of the federal habeas petition. See Burton v. Stewart, 549 U.S. 147, 156 (2007). See also Chew v. Hendricks, Civil Action No. 04-5894, 2007 WL

9

2437830 (D.N.J. Aug. 23, 2007) (applying <u>Burton</u> and running federal limitations period from date of re-sentencing after state petition for post-conviction relief).

Accordingly, Petitioner's conviction became final on June 24, 2007, twenty days after the Appellate Division issued its decision affirming Petitioner's amended sentence. <u>See</u> N.J.Ct.R. 2:12-2(a) (allowing twenty days to file a petition for certification from a decision of the Appellate Division). Petitioner then had until June 24, 2008, to file his federal habeas petition, unless there were grounds for statutory or equitable tolling.

To statutorily toll the limitations period, a state petition for post-conviction relief must be "properly filed."

> An application is "filed," as that term is commonly understood, when it is delivered to, and accepted by the appropriate court officer for placement into the official record. And an application is "<u>properly</u> filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. In some jurisdictions the filing requirements also include, for example, preconditions imposed on particular abusive filers, or on all filers generally. But in common usage, the question whether an application has been "properly filed" is quite separate from the question whether the claims <u>contained in the application</u> are meritorious and free of procedural bar.

<u>Artuz v. Bennett</u>, 531 U.S. 4, 8-9 (2000) (citations and footnote omitted) (finding that a petition was not "[im]properly filed" merely because it presented claims that were procedurally barred under New York law on the grounds that they were previously determined on the merits upon an appeal from the judgment of conviction or that they could have been raised on direct appeal but were not).

An application for state post-conviction relief is considered "pending" within the meaning of § 2244(d)(2), and the limitations period is statutorily tolled from the time it is "properly filed," during the period between a lower state court's decision and the filing of a notice of appeal to a

10

higher court, Carey v. Saffold, 536 U.S. 214 (2002), and through the time in which an appeal could be filed, even if the appeal is never filed, Swartz v. Meyers, 204 F.3d at 420-24. More specifically, "[t]he time that an application for state post conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." Evans v. Chavis, 546 U.S. 189, 191 (2006) (finding that time between denial of post-conviction relief and filing of appeal was not tolled where appeal was untimely, even where state considered untimely appeal on its merits). However, "the time during which a state prisoner may file a petition for writ of certiorari in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations under 28 U.S.C. § 2244(d)(2)." Stokes v. District Attorney of the County of Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert. denied, 534 U.S. 959 (2001).

Here, Petitioner properly filed his state PCR petition on December 3, 2007, 162 days after his conviction became final on June 24, 2007. The federal limitations period, then, was statutorily tolled until August 3, 2010, when the Supreme Court of New Jersey denied certification with respect to the denial of PCR relief. This habeas Petition is deemed filed on February 7, 2011,[4] another 188 days later. Thus, this Petition, filed 350 days into the one-year federal limitations period, is timely.

---

[4] **Error! Main Document Only.**"[A] pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court." Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)).

11

B.   The Identification Claim

Petitioner asserts that the showup identification procedure was impermissibly suggestive, in violation of his constitutional rights.

On direct appeal, the Supreme Court of New Jersey rejected this claim:

IV.

We turn now to defendant's alternative argument that the victim's out-of-court identification was both impermissibly suggestive and lacked reliability.

The United States Supreme Court has recognized that in many instances eyewitness identifications have proven unreliable. In United States v. Wade, 388 U.S. 218, 229 (1967), Justice Brennan, writing for the Court, stated that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." Justice Brennan recognized that "[a] major factor contributing to mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." Id. at 228, .... Consequently, the Court held that counsel should be present at pretrial identifications. Ibid.

The same day the Court decided Wade, it also held that whether a showup is constitutional under the Fourteenth Amendment is determined by evaluating the totality of the circumstances. Stovall v. Denno, 388 U.S. 293, 302, ... (1967). In Stovall, the police brought the defendant handcuffed to one of the police officers into the victim's hospital room the day after the defendant allegedly stabbed her. Id. at 295 .... The victim responded affirmatively when the police asked her whether the defendant "was the man." Ibid. The Court concluded that this confrontation was necessary because: (1) the only person that could exonerate the defendant was in the hospital; (2) the hospital was not far from the courthouse and jail; and (3) no one knew how long the victim might live. Id. at 302 .... The Court found that because a station lineup was not possible, the police followed the only feasible procedure. Ibid. The Court did not find that the identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." Id. at 302 ....

Several years later, in Neil v. Biggers, 409 U.S. 188, 194 ... (1972), the Supreme Court addressed the validity of a showup identification procedure that occurred seven months after the incident. In reviewing its prior decisions, the Court found it unclear whether "unnecessary suggestiveness alone requires the exclusion of evidence." Id. at 198-99 .... The Court answered the question in the negative and held that the test was "whether under the 'totality of the circumstances' the

12

identification was reliable even though the confrontation procedure was suggestive." Id. at 199 ... . After weighing the particular facts of that case, the Court found that there was "no substantial likelihood of misidentification." Id. at 201 ... .

In Manson v. Brathwaite, 432 U.S. 98, 99 ... (1977), the Court again was presented with the question whether, apart from any consideration of reliability, a pretrial identification procedure that was impermissibly suggestive should be excluded. The Supreme Court sought to clarify the law because the lower courts had developed two approaches for dealing with such evidence. Id. at 110 ... . One approach required exclusion of out-of-court identification evidence only if it were obtained through impermissibly suggestive confrontation procedures without regard to its reliability, while the other approach considered the reliability prong if the out-of-court identification procedure was found to be suggestive. Ibid. The Supreme Court concluded that "reliability is the linchpin in determining the admissibility of identification testimony." Id. at 114 ... . The Supreme Court explained that the following factors should be considered in determining reliability:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

[ Ibid.]

In sum, the Supreme Court's two-step analysis requires the court first to ascertain whether the identification procedure was impermissibly suggestive, and, if so, whether the impermissibly suggestive procedure was nevertheless reliable. The totality of the circumstances must be considered in weighing the suggestive nature of the identification against the reliability of the identification.

...

## V.

We turn now to apply the two-step analysis to the present case. First, we must determine whether the showup procedure at the hospital was impermissibly suggestive.

We start with the commonsense notion that one-on-one showups are inherently suggestive. Those showups by definition are suggestive because the victim can only choose from one person, and, generally, that person is in police

13

custody. Our case law recognizes, however, that standing alone a showup is not so impermissibly suggestive to warrant proceeding to the second step. ...

In the present case, during the pretrial hearing, Valentin testified that while he was being treated at the hospital, a police officer told him they had located his car and that they would take him "to Harrison to identify the person." On cross-examination, Valentin agreed that he told the grand jury the police had said "we found your car, we located your car with somebody in it, we want you to come with us to identify the person." Valentin also testified that while he was at the police station, an officer told him that the individual was now in the hospital and that they would take him to "the hospital to identify [the man]." In addition, Lieutenant Mecka testified that he informed Valentin "that his vehicle was recovered, ... there was an occupant, and that we were going to go out there to look, let him look at the occupant."

We conclude that in combination with the suggestiveness inherent in a showup, the added comments by the police rendered the showup procedures in the out-of-court identification of defendant impermissibly suggestive. Those comments made by the police to the victim were inappropriate because they may have influenced the victim to develop a firmer resolve to identify someone he might otherwise have been uncertain was the culprit. ...

We turn now to determine whether the impermissibly suggestive showup procedure was nevertheless sufficiently reliable to warrant the admissibility of the identification by the victim. We must consider the totality of the circumstances surrounding the identification procedure. ... The Manson factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, supra, 432 U.S. at 114 ...

We consider together the first two Manson factors concerning the opportunity of the witness to view the criminal and the witness's degree of attention. Valentin testified that while he was leaving his security job, defendant stopped his bicycle and said something to him. A conversation followed in which defendant asked Valentin for money. When Valentin declined, defendant punched Valentin twice, causing him to lose consciousness. Later, Valentin told the police that during his employment as a security guard, he had observed defendant in the area almost daily, but did not know defendant's name. In finding that the identification procedure was reliable, the trial court underscored that defendant was "not a person who was a stranger to Valentin." We agree that fact is significant, if not controlling. Valentin had previously seen defendant on a daily basis even though he did not know his name, and he had sufficient opportunity to observe defendant during the attack. Although at the time Valentin described defendant to the police he did not indicate he recognized defendant from seeing him in the

14

neighborhood, the trial court credited Valentin's testimony, and we accept that finding.

The next Manson factor is the accuracy of Valentin's description of defendant. At the Wade hearing, Valentin testified that he told the police that the assailant had very short black hair, a scar on the left side of his face, was a little husky, and wore a white jacket with red on it. When asked on cross-examination if he had told the police the man was wearing a black jacket, Valentin replied he did not know. Valentin also did not recall whether the man had any facial hair. Officer Gohde testified that he took a statement from Valentin after the showup at the hospital. He stated that Valentin described defendant as having "olive skin, ... my height, five-six to five-seven ... wearing blue jeans, sneakers, and had a shaved head, ... [and] a scar on his face."

Defendant urges that the description Valentin gave to the officer at the scene did not match him because he was wearing a black leather jacket with a circle insignia in red and black at the time of his arrest, not a white jacket as Valentin described. From the record, we are unable to determine whether Valentin provided an accurate description of defendant to the police. Although Officer Miller did not testify at the pretrial hearing, at trial he testified that when he arrived at the scene, Valentin was bleeding and shaken up. Miller stated that Valentin described his assailant as a Hispanic male, about 5'7", wearing blue jeans, white sneakers, and a black jacket with red lettering. The trial court did not make a finding with regard to Valentin's description of defendant but did note that there was an issue "whether or not there was a scar, not a scar on the face, left side, his clothing, but [Valentin] testified he had seen him before ... and he used to see him almost every day." Consequently, we are unable to evaluate this factor.

The last two Manson factors are the "level of certainty demonstrated at the confrontation" and "the time between the crime and the confrontation." The trial court found that Valentin quickly identified defendant while he was sitting on a hospital bed, and we accept that finding. The court, however, made no finding on the length of time between the incident and the showup except to say that "some time had passed."

Apart from the trial court's findings, our review of the record satisfies us that the showup took place within a reasonable time. The offense occurred shortly after 12:00 a.m. Following apprehension of defendant at the scene of the accident, the police sought and received authorization from an assistant prosecutor to conduct a showup around 2:50 a.m. Subsequently, the police went to St. Mary's Hospital in Hoboken to have Valentin accompany them back to the Harrison Police Station for the showup. Upon learning defendant had been taken to West Hudson Hospital, the police transported Valentin to the emergency room where he immediately identified defendant. Based on those facts, the State asserts that the identification procedure occurred within a reasonable time. We agree. We conclude

15

> that an approximate five-hour period between the incident and the identification
> does not subvert the reliability of the identification procedure.
>
> Weighing the above factors in favor of reliability against the corrupting effects of the impermissibly suggestive procedure, we are satisfied that the identification procedure was reliable and did not result in a substantial likelihood of misidentification. In particular, the evidence that Valentin had seen defendant on a daily basis in the month prior to the incident is strong evidence in support of reliability of Valentin's identification of defendant. Based on the totality of the circumstances, we conclude that the trial court properly admitted Valentin's out-of-court identification of defendant

State v. Herrera, 187 N.J. at 182-186 (footnotes and citations omitted).

As is evident from the New Jersey Supreme Court's thoughtful analysis, the court correctly identified and applied the controlling U.S. Supreme Court precedents governing analysis of showup identifications. See United States v. Brownlee, 454 F.3d 131 (3d Cir. 2006) (analyzing showup identification procedure under Manson v. Brathwaite, supra); United States v. Diaz, 444 F.App'x 551, 554-55 (3d Cir. 2011) (applying Neil v. Biggers, supra, in analyzing showup identification procedure). Hence, the state court's decision is certainly not "contrary to" Supreme Court precedent. Moreover, Petitioner has not demonstrated that the New Jersey Supreme Court's decision is based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to relief on this claim.

C. The Ineffective Assistance Claims

Petitioner argues that his trial and appellate counsel were ineffective in failing to argue that the latest scientific techniques should have barred the identification testimony under either the state or federal constitution.

On direct appeal, Petitioner argued to the Supreme Court of New Jersey, through counsel, that the State should adopt, under the state constitution, a new and more rigorous test for admissibility of showup identifications than that required by the U.S. Constitution. More

16

specifically, Petitioner argued that because showup identifications are, by their nature, suggestive, they should be admissible only when the showup is necessary. "That is, showup identification evidence should be admitted only if exigent circumstances that require immediate identification are present. Under that approach, defendant argues that a showup conducted without exigent circumstances would be inadmissible regardless of any indication of reliability." State v. Herrera, 187 N.J. at 498-99. The Supreme Court of New Jersey noted that three states had adopted such a more rigorous test, but it declined to adopt a new standard under the New Jersey constitution, because Petitioner had failed to raise the issue and create an appropriate record below, and because the State had consistently applied federal constitutional precedent in deciding the admissibility of identification evidence. Id. Petitioner points to counsel's failure to raise this issue at the trial and Appellate Division levels as the basis for his claim of ineffective assistance.

On appeal of the denial of PCR relief, however, the Appellate Division rejected this claim.

> Pursuant to the Sixth Amendment of the United States Constitution, every criminal defendant is guaranteed assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685 ... (1984). Whether "retained or appointed," such counsel must "ensure that the trial is fair"; therefore, "'the right to counsel is the right to the effective assistance of counsel.'" Id. at 685-86 ... ...
>
> In order to establish a prima facie case of ineffective assistance of counsel, defendant must demonstrate a reasonable likelihood of succeeding under the two-prong test established by Strickland, supra, 466 U.S. at 687 ... . First, defendant must show that defense counsel's performance was indeed deficient. Second, defendant must demonstrate that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.
>
> There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Further, because prejudice is not presumed, a defendant must demonstrate how specific errors of counsel undermined the reliability of the proceeding.
>
> An evidentiary hearing is required only when the facts viewed in the light most favorable to the defendant would entitle the defendant to post-conviction

17

relief. State v. Marshall, 148 N.J. 89, 158, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L. Ed.2d 88 (1997). ...

    Defendant's argument concerning the identification procedures ignores that the Supreme Court granted certification to review the identification issue framed by him. 185 N.J. 35 (2005). In its opinion, the Supreme Court noted the growing criticism of the established analytical framework governing the admissibility of eyewitness identification, Herrera, supra, 187 N.J. at 499-501, 902 A.2d 177, reviewed defendant's argument that the victim's out-of-court identification was impermissibly suggestive and lacked reliability, id. at 501-09, 902 A.2d 177, and requested the Criminal Practice Committee and the Model Jury Charge Committee to consider the identification charge, id. at 510, 902 A.2d 177. Notably, as to the victim's identification of defendant, the Court concluded that the impermissibly suggestive show-up procedure used in this case was nevertheless "reliable and did not result in a substantial likelihood of misidentification." Id. at 509, 902 A.2d 177.

State v. Herrera, 2010 WL 816816 at *2-*3 (citations omitted).

As illustrated by the above quotation, the Appellate Division correctly identified the Strickland two-prong standard that applies to claims of ineffective assistance of trial counsel under the Sixth Amendment. In addition, the United States Supreme Court has emphasized that, to prevail on a claim of ineffective assistance of trial counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. Strickland, 466 U.S. at 687, 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Nevertheless, the Supreme Court has advised that the performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose

of an ineffectiveness claim on the ground of lack of sufficient prejudice … that course should be followed." Strickland, 466 U.S. at 697.

Furthermore, the Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985). The Strickland standard for effective assistance of trial counsel also applies to appellate counsel. See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). See also United States v. Turner, 677 F.3d 570, 577 (3d Cir. 2012) ("Attorneys need not, and should not, raise every … claim but rather may select among them in order to maximize the likelihood of success on appeal.") (quoting Showers v. Beard, 635 F.3d 625, 634 (3d Cir. 2011)) (internal quotation marks omitted).

Here, Petitioner has presented nothing to suggest that trial and appellate counsel's failure to argue in favor of a new state-law standard for evaluating showup identifications, that has been adopted in only three states, constituted representation that fell below an objective standard of reasonable professional assistance. In any event, as the Appellate Division noted, the Supreme Court of New Jersey found that the identification was reliable and did not result in a substantial likelihood of misidentification. Moreover, there was additional evidence of Petitioner's guilt, including his presence with the stolen car and his possession of the black belt keepers that had been taken from Valentin and that he identified as his. (Answer, Ex. Ra154-156, Opinion of Appellate Division (Feb. 23, 2005).) Thus, even if counsel did err, Petitioner has not established that the

19

error deprived him of a fair trial with a reliable result. The decision of the Appellate Division is neither contrary to nor an unreasonable application of controlling Supreme Court precedent. Nor is the Appellate Division decision based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to relief on this claim.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. No certificate of appealability will issue.

## V. CONCLUSION

For the reasons set forth above, the Petition will be denied. An appropriate order follows.

_____
Stanley R. Chesler
United States District Judge

Dated: